**NOT FOR PUBLICATION**                                                                                  **CLOSED**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| VASANT B. SHAH | |
|        Plaintiff, | Civil No. 06-3106 |
| v. | Hon. Faith S. Hochberg, U.S.D.J. |
| BROADSPIRE SERVICES, INC. | **OPINION** |
| UNITED PARCEL SERVICE OF AMERICA, | |
| INC., THE FLEXIBLE BENEFITS PLAN, | |
|       Defendants. | Date: August 2, 2007 |

**HOCHBERG, District Judge:**

This matter comes before this Court upon the Plaintiff's Motion for Summary Judgment and for Attorneys Fees[1] and the Court's May 10, 2007 oral argument on these motions.

**I.    Factual Background**[2]

Plaintiff Vasant B. Shah worked for non-party United Parcel Service, Inc., ("UPS, Inc.") an affiliate of Defendant United Parcel Service of America, Inc. ("UPS"), for 13 years as a computer technician. In December of 1999, Plaintiff ceased work due to the cumulative effect of injuries suffered in a series of car accidents. Plaintiff subsequently underwent extensive surgery

---

[1] Magistrate Judge Patty Shwartz issued an order in this case on October 26, 2006, which specifically stated that "[a]ny and all dispositive cross-motions must be filed no later than March 2, 2007." See Order dated October 26, 2006, at ¶11 [Docket #6] (emphasis added). Plaintiff filed his motion for summary judgment on March 2, 2007 in compliance with this order; on March 19, 2007, the date for any reply briefs, Defendants sought to file a Cross-Motion for Summary Judgment. Although Defendants motion was untimely, the Court has nonetheless considered it and it is **DENIED**.

[2] This factual background summary is taken from uncontested facts in Plaintiff's and Defendants' L. Civ. R. 56.1 Statements of Material Facts.

for spinal injuries, and currently remains incapacitated by severe neck and back impairments.

For the first six months of 2000, Plaintiff collected short-term disability benefits. Plaintiff then applied and was approved for long-term disability benefits ("LTD benefits") provided by UPS pursuant to an employee welfare benefit plan, Defendant The Flexible Benefits Plan ("the Plan").  However, on September 30, 2004, Defendant Broadspire Services, Inc.[3] ("Broadspire") – an entity to which UPS delegated claims-processing and benefit-payment services for LTD benefits – chose to halt Plaintiff's disability payments.  Broadspire had concluded that Plaintiff was no longer considered "disabled" under the terms of the Plan.

Plaintiff appealed Broadspire's decision to the UPS Claims Review Committee (the "Committee"), a committee appointed by UPS with the fiduciary responsibility to review claims for benefits under the Plan, on February 16, 2006.  The Committee agreed with Broadspire, finding that the record demonstrated that Plaintiff was not "disabled" under the terms of the Plan as of October 1, 2004.  As such, the Committee denied Plaintiff's appeal on March 21, 2006.

Following the exhaustion of this appeals process as is required by 29 U.S.C. § 1133, Plaintiff filed this action pursuant to Section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(f), seeking recovery of benefits pursuant to the Plan.  Plaintiff also seeks attorney's fees and interest pursuant to 29 U.S.C. § 1132(g), which may be awarded to the prevailing party at the discretion of the Court.  Jurisdiction is proper pursuant to 29 U.S.C. § 1331 due to provisions in the ERISA statute (specifically, 29 U.S.C. § 1132(e)(1) and 29 U.S.C. § 1132(f)).

---

[3]Broadspire was formerly known as Kemper National Services.

**II.     Analysis**

    **A.     Summary Judgment Standard**

Pursuant to Fed. R. Civ. P. 56(c), a motion for summary judgment will be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In other words, "summary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party." Miller v. Indiana Hosp., 843 F.2d 139, 143 (3d Cir. 1988). A fact is material if it might affect the outcome of the case, and an issue is genuine if the evidence is such that a reasonable fact finder could return a verdict in favor of the nonmovant. Anderson, 477 U.S. at 248 (1986); In re Headquarters Dodge, 13 F.3d 674, 679 (3d Cir. 1993).

    **B.     Standard of Review**

Where an ERISA-governed benefit plan gives the plan administrator or fiduciary discretion in "interpret[ing] the plan and making benefits determinations," as Defendants have in this case, a court reviewing a benefits denial employs an "arbitrary and capricious" standard. Skretvedt v. E.I. Dupont De Nemours & Co., 268 F.3d 167, 173-74 (3d Cir. 2001). Under this standard, the reviewing court must defer to the administrator unless its decision was "without reason, unsupported by substantial evidence, or erroneous as a matter of law." Pinto v. Reliance Standard Life Ins. Co., 214 F.3d 377, 392 (3d Cir. 2000) (noting that a plan administrator's decision is supported by substantial evidence if the evidence is sufficient for a reasonable person

to agree). The arbitrary and capricious standard is then heightened where the structure of a plan presents an inherent conflict of interest or where specific facts in evidence call the impartiality of the administrator into question. Pinto, 214 F.3d at 383-84; Goldstein v. Johnson & Johnson, 251 F.3d 433, 442 (3d Cir. 2001); Kosiba v. Merck & Co., 384 F.3d 58, 65-66 (3d Cir. 2004). For instance, the Third Circuit has found that the potential for a conflict of interest exists where an employer both funds and administers a plan. Smathers v. Multi-Tool, Inc./Multi-Plastics, Inc., 298 F.3d 191, 197 (3d Cir. 2002). In Pinto, the Third Circuit established a "sliding scale approach" to use in such cases, intensifying the degree of scrutiny to match the degree of the conflict. 214 F.3d at 391. However, even if the court applies a heightened arbitrary and capricious standard of review, the Third Circuit has held that "a court may not substitute its own judgment for that of the plan administrators." Stratton v. E.I. DuPont De Nemours & Co., 363 F.3d 250, 256 (3d Cir. 2004) (citing Smathers, 298 F.3d at 199). Moreover, the Third Circuit has also found "that the risk of a conflict of interest is decreased where the administrator and funder of the plan is the employer, rather than an insurance company, because the employer has 'incentives to avoid the loss of morale and higher wage demands that could result from denials of benefits' suggesting that there is at least some counter to the incentive not to pay claims." Smathers, 298 F.3d at 197 (quoting Nazay v. Miller, 949 F.2d 1323, 1335 (3d Cir. 1991)).

Regardless of which standard a court applies, it "must base its ultimate determination on the record before the plan administrator." Kosiba, 384 F.3d at 69. The Court may only overturn a plan administrator's decision "if it is clearly not supported by the evidence in the record or the administrator has failed to comply with the procedures required by the plan." Smathers, 298 F.3d at 199.

In this case, Defendant UPS is both the "sponsor" and the "Plan Administrator" of the

Plan, though it is important to note that UPS is an employer, and not an insurance company. Thus, a slightly heightened standard of review is applied.

### C.    Record Before and Decision of the Claims Administrator

Among other documents, the record before the claims administrator included the following information:

(1) <u>LTD Questionnaires from December 20, 2001 and November 17, 2003</u> – Plaintiff completed two "Long Term Disability" questionnaires.  In the first, he described some activities he could perform, which included some driving, dressing himself, doing laundry with the help of his son.  In the second, he reported continued pain and stated that he was unable to engage in any gainful employment as a result.  He also reported that he could perform "personal needs," such as bathing and dressing, without assistance, but required assistance to perform simple chores like shopping and laundry.

(2) <u>Dr. Ulises C. Sabato's Attending Physician Statement and Evaluation of Physical Disabilities, January 9, 2004 and January 14, 2004</u> – Dr. Sabato's report indicated that Plaintiff suffered from "neck & lower back pain" with numbness in both hands, and experienced physical restrictions in connection with "reaching" and "lifting, carrying, [and] pushing."  He categorized Plaintiff's level of physical impairment as "Class 4 – Marked limitation of functional capacity/capable of performing sedentary work."  <u>See</u> Appendix, UPS0434-452.

(3) <u>Peer Review by Dr. Vaughn D. Cohan, dated March 18, 2004</u> – Dr. Cohan did not evaluate Plaintiff personally, but reviewed his medical file as of the date of the report.  He had "no recent medical records" from "any of the treating physicians," but reviewed Dr. Sabato's reports of January 9, 2004 and January 14, 2004, as well as an earlier report of Dr. Sabato from December 13, 2002.  He concluded that "the documentation presented does not demonstrate objective evidence of a functional impairment which would preclude work.  It appears that the claimant is capable of sedentary activity."  <u>See</u> Appendix, UPS0343.

(4) <u>Exercise Physiologist Maria Pagano's Functional Capacity Evaluation, May 5, 2004</u>
Defendants' exercise physiologist noted that Plaintiff was unable to complete certain tests due to pain.  She concluded that Plaintiff had a "sitting tolerance" of one hour, and a "standing tolerance" of 30-45 minutes.  She also found that repeated movements below the waist or involving the left shoulder were "poorly tolerated" and could "negatively affect" Plaintiff's job performance.  Ms. Pagano

        recommended a "graded reentry" to the workplace. See Appendix, UPS0515-523.

(5)    Vocational Consultant Scarbrough's Employability Assessment, August 17, 2004
Defendants' consultant, Stacy Scarbrough, included in her report comments by Plaintiff from a phone interview, where he stated that he would like to return to work if possible. In addition to the phone interview, Ms. Scarbrough reviewed the following materials in compiling her report: the 5/5/2004 functional capacity assessment by Ms. Pagano, an unsigned "Evaluation of Physical Abilities Form" dated 5/3/2004, and a General Peer Review report by Dr. Vaughn D. Cohan dated 3/15/2004.[4] Based on these materials, Ms. Scarbrough deduced that Plaintiff was capable of sedentary work. She then factored in Plaintiff's employment history, education, and employment opportunities in the region, and determined that there were many jobs available for which Plaintiff would be qualified, and which he would be able to perform based on his work restrictions.[5]

(6)    Social Security Practice Form, January 5, 2006 by Dr. Rosenbaum
Dr. Rosenbaum's comments on the form included findings of neck and shoulder pain, tingling sensation in the fingers, and muscle weakness. It indicated that Plaintiff could sit for 15 minutes at a time and stand for 10 minutes at a time; could not crouch, squat, or climb ladders; and could not be expected to lift more than 10 pounds.

(7)    Letter from Dr. Sabato, March 9, 2005
This letter was sent by Dr. Sabato after the initial denial of Plaintiff's benefits. It details a CT scan performed on January 26, 2005; a EMG performed on January 28, 2005; and a "lumbosacral epidural nerve block" procedure performed on February 16, 2005. The letter concludes by stating that it is Dr. Sabato's opinion that Plaintiff is in a "chronic state of pain" which made it "impossible for [Plaintiff] to carry out work[-]related activities in the foreseeable future." No medical records accompanied the letter.

(8)    Letter from Attorney Steven Gaetcher, January 16, 2006
This letter attached medical records from Dr. Sabato from February and May of 2005, the January 26, 2005 CT scan report, a January 26, 2005 MRI report, a January 28, 2005 electromyogram and nerve conduction study report, operative and radiological reports of Dr. Sabato from February 2005, a report of a neurological consultation from May 5, 2005, and a Social Security Disability

---

[4] As far as the Court can tell, this report is actually dated March 18, 2004, not March 15, 2004. See Appendix in Support of Plaintiff's Motion for Summary Judgment dated March 6, 2007 (heretofore "Appendix"), at UPS0343-344.

[5] The report lists eight specific jobs, and states that they are "only a few of the jobs" Plaintiff had the skills to perform and fit within Plaintiff's physical limitations (as determined by Ms. Scarbrough).

       Practice form dated January 5, 2006 and completed by Dr. Sabato's partner, Dr. Rosenbaum.

(9) <u>Peer Reviews by Dr. Riso</u>
Dr. Riso conducted an initial peer review in May 2005, which he updated at the end of January 2006 after receiving the additional documentation from Plaintiff attached to Mr. Gaetcher's letter. Dr. Riso ultimately concluded that "a functional impairment would not be supported for an 'any occupation' type position." Dr. Riso thus recommended sedentary work, but placed restrictions on Plaintiff's activity which included only occasionally lifting less than 10 pounds; no crouching, stooping squatting or climbing ladders; minimizing range of motion of the neck, overhead reaching, and extensive physical manipulation.[6] <u>See</u> Appendix, at UPS0628-632.

(10) <u>Peer Reviews by Dr. Nitz</u>
Dr. Nitz conducted an initial peer review in January 2006, which he updated at the beginning of February 2006 after receiving the additional documentation from Plaintiff attached to Mr. Gaetcher's letter. Dr. Nitz concluded that Plaintiff's medical record did "not support a functional impairment that would preclude work activity at a sedentary level." He also stated that Plaintiff should be restricted to only occasional reaching overhead, bending, stooping and kneeling; that he should be able to frequently change posture; and that these restrictions should be permanent. <u>See</u> Appendix, at UPS0624-627.

**D.**     **Analysis**

Plaintiff argues that Defendants Broadspire and UPS wrongfully terminated his benefits. As noted above, the Court "must base its ultimate determination on the record before the plan administrator," <u>Kosiba</u>, 384 F.3d at 69, and the Court may only overturn a plan administrator's decision "if it is <u>clearly not supported</u> by the evidence in the record or the administrator has failed to comply with the procedures required by the plan." <u>Smathers</u>, 298 F.3d at 199. A court reviewing a benefits denial employs an "arbitrary and capricious" standard. <u>Skretvedt v. E.I. Dupont De Nemours & Co.</u>, 268 F.3d 167, 173-74 (3d Cir. 2001)

---

[6]Dr. Riso's report contains a line that states "[a] position which minimizes range of motion of the neck, overhead reaching or extensive physical manipulation should likewise be avoided." <u>See</u> Appendix, at UPS0631. This line is clearly a misstatement – in context, Dr. Riso is counseling <u>against</u> Plaintiff taking a position that requires range of motion of the neck, overhead reaching or extensive physical manipulation.

Here, Plaintiff's benefits were initially denied by Broadspire; that decision was appealed to the Committee, who affirmed Broadspire's conclusion after a review of the administrative record. The Committee found that the Functional Capacity Evaluation ("FCE") had indicated that Plaintiff had serious physical limitations, including "changing postures as needed, avoiding repetitive movements involving lumbar flexion or motions of the upper left extremities, overhead movements, movements below the waist, avoiding lifting anything above negligible weight, etc." See Appendix, at UPS0142. Nevertheless, the Committee concluded that "the medical documentation from Mr. Shah's treating physicians did not provide sufficient objective medical documentation to support a finding of an impairment that would preclude him from performing the material and substantial duties of any gainful occupation from October 1, 2004 onward" Id. More specifically:

> although [Plaintiff] may suffer from polyradiculopathies of the back, neck and upper extremities with corresponding pain and physical limitations, he is capable of working at a sedentary job that can accommodate his limitations ... [and] jobs that can accommodate his limitations, based on the FCE and Employability Assessment, exist in substantial numbers in Plaintiff's relevant geographical area.

Id., at UPS0144. The Committee based its decision on its review of the medical records of Plaintiff's treating physicians; peer reviews completed by non-treating physicians; the results of an FCE conducted by an exercise physiologist; and the results of an Employability Assessment conducted by a non-physician consultant.

The most significant issue before this Court is the plan administrator's Employability Assessment. The Committee noted that Plaintiff's "employability was assessed" via the FCE and the Employability Assessment. Id. at UPS0142. The FCE was conducted over a single two-hour period in May 2004 by an exercise physiologist who was a consultant to the plan administrator. Id. at UPS0437. The physiologist, Maria Pagano, includes a brief history of Plaintiff's injury and

references "medical records," but it is not at all clear which medical records from which of Plaintiff's treating physicians Ms. Pagano reviewed, and to what extent (if at all) those records informed Ms. Pagano's conclusions.  See id.  Ms. Pagano's conclusions are that Plaintiff would be capable of sedentary work provided he could change postures as needed, would not need to lift any substantial weight, would not need to stand for more than thirty to forty-five minutes at a time, would not need to stoop or crouch, would not need handle any tool or equipment that is sharp, awkward or temperature sensitive, would not need to rotate his left shoulder, and would not need to sit for longer than one hour.  See id.

The Employability Assessment, completed in August 2004, was also performed by a non-physician consultant retained by the plan administrator.  The Committee's decision states that the findings in the Employability Assessment were based on a "review of records submitted by [Plaintiff's] treating physicians, recommendations by a peer reviewer, the May, 2004 FCE, a questionnaire completed by [Plaintiff] on November 17, 2003 indicating his daily activities, and a telephonic interview with [Plaintiff] completed on June 8, 2004."  However, the Employability Assessment does not indicate that the consultant ever consulted any medical records from Plaintiff's treating physicians.  Instead, Ms. Scarbrough states that in completing her assessment she reviewed a General Peer Review report by Dr. Cohan dated March 15, 2004; the May 5, 2004 FCE; a phone interview and a questionnaire completed by Plaintiff; and an "Evaluation of Physical Abilities Form" dated May 3, 2004, which Ms. Scarbrough noted was unsigned.[7]  Based on these materials, Ms. Scarbrough concluded that Plaintiff was capable of sedentary work subject to "limitations," but did not elaborate as to what those limitations were nor which

---

[7]This Court has been unable to locate this form in the record of the administrative process.  Counsel for Defendants could not identify it in the record either.

sedentary jobs could be done by a person with those limitations.

It appears, therefore, that Ms. Scarbrough derived her understanding of Plaintiff's capacity to work solely from the FCE; certainly, the interview and questionnaire completed by Plaintiff gave Ms. Scarbrough no medical guidance as to Plaintiff's potential work limitations.[8] Likewise, the General Peer Review report by Dr. Cohan could have provided Ms. Scarbrough with no understanding of the limitations of Plaintiff's potential work capacity; Dr. Cohan stated that he had reviewed "no recent medical records" from "any of the treating physicians" when reaching his conclusion that Plaintiff was "capable of sedentary activity."  See Appendix, UPS0343.

The Employability Assessment based its conclusions about Plaintiff's ability to work on the FCE, which is the only document that evaluates the specific chronic physical limitations of the Plaintiff.  Yet, the Employability Assessment failed to identify or even consider which subset of sedentary work could be performed by a person who cannot sit for one hour, nor stand for over 15 minutes, nor reach in ways that affect the shoulder, nor crouch, nor lift more than minimal weight.  This Employability Assessment is itself the sole basis for the Committee's conclusion that "jobs that can accommodate [Plaintiff's] limitations ... exist in substantial numbers."  Thus, the determination that jobs exist that Plaintiff can physically perform, with his severe limitations, is itself based on a flawed Employability Assessment that fails to consider which sedentary jobs could be done by one with the limitations noted by Defendants' physiologist, Ms. Pagano.  In sum, Ms. Scarbrough failed to analyze the full set of physical limitations stated by Ms. Pagano.

Ms. Scarbrough lists eight potential jobs which she reports are "only a few of the jobs Mr.

---

[8]As the unsigned May 3, 2004 form was not identified in the record by Defendants' counsel, it will not be considered here.

Shah has the skills to perform." She makes no effort, however, to determine whether a person with Mr. Shah's physical limitations could actually perform these jobs. For example, among the jobs listed is "Invoice-Control Clerk." The job requires the employee to "compile[] data from vendor invoices and supporting documents to verify accuracy of billing data and to ensure receipt of items ordered, using calculator and computer." Similarly, the Employability Assessment suggests the job "Graphic Designer," in which the employee "[d]esigns aret and copy layouts for material to be presented by visual communications such as books, magazines, newspapers, television, and packaging." The FCE notes that Mr. Shah cannot sit for more than an hour. Furthermore, the peer review reports note that Mr. Shah would need to be able to "get up and change positions at will." Nothing in the Employability Assessment analyzes whether any of the jobs listed would provide this free range of motion or whether any of these jobs would be available to an employee who could only sit for one hour. The FCE also notes that "bimanual tasks are also poorly tolerated and may negatively affect performance." Yet, again, the Employability Assessment makes no effort to determine whether the jobs suggested could be performed by someone incapable of performing bimanual tasks.

As a result, the Committee based its conclusion that Plaintiff is "employable" on an Employability Assessment which failed to consider Plaintiff's physiological limitations, as found by the plan administrator's own exercise physiologist, Ms. Pagano, in determining which sedentary jobs Plaintiff could actually do. For this reason, the Court holds that Defendants' denial of Plaintiff's Basic LTD benefits <u>was</u> arbitrary and capricious.[9]

---

[9]This case is distinguishable from <u>Feigenbaum v. Merrill Lynch</u>, Civil Action No. 06-1075, for which this Court also issues a summary judgment decision today. There, Plaintiff was unable to meet her burden of demonstrating that the decision to terminate her benefits was "arbitrary and capricious," in part because she failed to produce medical proof of her disability within the reasonable time limits set by the ERISA plan administrator.

**III.     ATTORNEY'S FEES**

Section 502(g)(1) of ERISA provides that "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party," 29 U.S.C. § 1132(g)(1).  In determining whether to make any award of fees under ERISA, the Third Circuit requires district courts to consider five policy factors:

(1) the offending parties' culpability or bad faith;

(2) the ability of the offending parties to satisfy an award of attorneys' fees;

(3) the deterent effect of an award of attorneys' fees against the offending parties;

(4) the benefit conferred on members of the pension plan as a whole; and

(5) the relative merits of the parties' position.

Ursic v. Bethlehem Mines, 719 F.2d 670, 673 (3d Cir. 1983).  See also Anthuis v. Colt Indus. Operating Corp., 971 F.2d 999, 1011 (3d Cir.1992) (holding that analysis of the Ursic factors is regarded "as a mandatory requirement").

Plaintiff requests attorneys fees in this action, but does not provide any briefing on the Ursic factors or an affidavit as required under Local Civil Rule 54.2 requires attorneys requesting compensation for services rendered and reimbursement of expenses to file an affidavit with the Court which sets out: (1) the nature of the services rendered, the results obtained, any particular novelty or difficulty involved in the matter; (2) the dates of services; (3) a breakdown of the services rendered, the identity of the person providing the services, the professional experience of that person; (4) the time spent rendering the services; and (5) the normal billing rate for each person providing services. Local Civ. R. 54.2(a).

Thus, the Court is unable to make a determination regarding attorneys fees at this time.

### IV.     CONCLUSION

For the reasons stated above, Plaintiffs' motion for summary judgment is **GRANTED**. Plaintiff may also make an application for an award of attorneys' fees in an amount to be determined after further briefing.  An appropriate order will issue.


                                                          /s/ Faith S. Hochberg

                                                          Hon. Faith S. Hochberg, U.S.D.J.